1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
     LG CAPITAL FUNDING, LLC,      :   16-CV-2217(CBA)(LB)
4                                  :
               Plaintiff,          :   U.S. Courthouse
5                                  :   Brooklyn, New York
                                   :
6                                  :   TRANSCRIPT OF
          -against-               :   CIVIL CAUSE FOR ORDER
7                                  :   TO SHOW CAUSE
                                   :
8                                  :   August 17, 2016
9    VAPE HOLDINGS, INC.,          :   10:30 a.m.
                                   :
10             Defendant.
     - - - - - - - - - - - - - X
11
     BEFORE:
12                    HONORABLE LOIS BLOOM, U.S.M.J.

13   APPEARANCES:

14   For the Plaintiff:        KEVIN KEHRLI, ESQ.
                               MICHAEL STEINMETZ, ESQ.
15

16

17
     For the Defendant:        MATTHEW PRESS, ESQ.
18

19

20

21

22   Court Reporter:       Holly Driscoll, CSR
                           Official Court Reporter
23                         225 Cadman Plaza East
                           Brooklyn, New York 11201
24                         (718) 613-2274

25   Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Assisted Transcript.
```

2

1          THE COURT:  Please be seated.

2          THE CLERK:  Civil cause for hearing, docket number

3    16-CV-2217, LG Capital Funding, LLC against VAPE Holdings,

4    Incorporated.

5               Will the parties please state your appearances.

6          MR. KEHRLI:  Good morning, Your Honor, Kevin Kehrli

7    of the law firm Garson, Segal, Steinmetz & Fladgate.  With

8    me is Michael Steinmetz and behind me is Joseph Lerman from

9    LG Capital.

10              MR. LERMAN:  Good morning, Your Honor.

11              MR. PRESS:  Good morning, Your Honor, Matthew Press

12   for VAPE Holdings, Inc., Press Law Firm, PLLC.

13         THE CLERK:  The Honorable Lois Bloom presiding.

14         THE COURT:  Good morning, Mr. Kehrli, Mr. Steinmetz,

15   Mr. Lerman and Mr. Press.

16              This is a hearing on plaintiff's motion for

17   preliminary injunction against VAPE Holdings, Inc. and

18   Judge Amon has referred this matter to me for a Report and

19   Recommendation.

20              On May 3rd, 2016, LG commenced this action against

21   VAPE alleging breach of contract for VAPE's failure to comply

22   with the terms of the $75,000 8 percent convertible redeemable

23   note that VAPE had issued to LG.  Upon commencing the action,

24   plaintiff moved for preliminary injunction.  Judge Amon denied

25   plaintiff's motion concluding that plaintiff had not

3

1  demonstrated irreparable harm, and that's at ECF 18.

2         After Judge Amon denied plaintiff's motion the

3  parties appeared before me for a settlement conference.  At

4  that settlement conference on June 8th, 2016 the parties

5  settled this matter on the record and the settlement was

6  reduced to a writing signed by counsel for both sides on

7  June 24th, 2016, and that settlement agreement is found at

8  ECF number 25-4.

9         Under the terms of the settlement agreement, VAPE

10  was to place in plaintiff's counsel's escrow account $151,000

11  by June 27th, 2016.  In exchange, there would be a mutual

12  general release and LG would assign the note.  VAPE failed to

13  remit the $151,000 into plaintiff's counsel's escrow account

14  by June 27, 2016.

15         I then held three telephone conferences with the

16  parties on July 18th, July 20th, and July 26th as VAPE stated

17  that with time it would be able to satisfy its obligation

18  under the settlement agreement, however, no progress was made.

19         Accordingly, on August 4th, 2016, plaintiff's

20  counsel moved for a prohibitory injunction enjoining VAPE from

21  issuing further conversions under any and all outstanding

22  convertible instruments during the pendency of this action,

23  from issuing transfer agent instructions to reserve shares for

24  the purpose of conversions under any and all outstanding

25  convertible instruments during the pendency of this action,

4

1    from issuing any further convertible notes or other debt

2    instruments during the pendency of this action, and finding

3    that the posting of a bond would not be required under

4    Federal Rule of Civil Procedure 65.

5              I have reviewed and considered both sides' papers

6    and I am prepared to hear arguments today.

7              I note that plaintiff moves to strike defendant's

8    opposition to the motion because defendant's filing was made

9    approximately four hours late, that's ECF number 28.  As no

10   prejudice was suffered by this short delay, that motion is

11   denied.  Okay.

12             First question, Mr. Kehrli and Mr. Steinmetz, did

13   they pay $151,000 into plaintiff's escrow account?

14             MR. KEHRLI:  No, they did not, Your Honor.

15             THE COURT:  Has VAPE made any payment toward the

16   settlement, full or partial?

17             MR. KEHRLI:  No, Your Honor.

18             THE COURT:  Now, I note before I came down the

19   parties asked for some time to discuss whether or not the case

20   could be resolved, so please bring me up to speed, Mr. Kehrli.

21             MR. KEHRLI:  We did briefly discuss.  In our

22   opinion, we did not get far at all.  That's sort of all I can

23   say I guess.  We did not find the conversation productive in

24   the end.

25             THE COURT:  So, can you give me, other than what

5

1  you've said in your papers, whatever it is that you want to

2  argue.  My question for you is what has changed regarding

3  VAPE's financial condition since the hearing before Judge Amon

4  on May 27 beside the breach of the settlement agreement in

5  this particular matter?

6          MR. KEHRLI:  Well, I think it hinges on the two

7  contracts which Judge Amon cited and relied on in coming to

8  her decision, one of which was a term sheet whereby GHS agreed

9  to buy out all of the other outstanding notes, and the other

10  was an agreement to buy $2 million worth of shares which GHS

11  had stated or which defendant, I apologize, had stated were

12  ample enough resources to draw on to satisfy all of their

13  outstanding notes and debts.  Clearly, having gone through the

14  process of trying to draw on those ample resources, those

15  contracts -- well, the first is only a proposed term sheet so

16  it's essentially nonbinding to GHS, and the second, those

17  ample resources aren't exactly there for defendant to draw on.

18          The stock of GHS since -- or VAPE, I apologize

19  again, from the date of filing to today has gone down by

20  400 percent.  It started at .006, today it is at .0015.  That

21  means the value of the conversion which started this whole

22  action has also gone down by 400 percent.  And basically we've

23  seen that VAPE does not have any resources to satisfy the

24  agreement which I genuinely believed that Mr. Press and the

25  CEO, Justin Braun, wanted to make to settle this matter.  The

6

1    only other explanation, if they did not truly intend, was that

2    it was done in bad faith to lower the potential exposure in

3    this action which I did refer to in my papers but I genuinely

4    do not want to believe that that's the case.

5         THE COURT:  Anything else that you want to add?

6         MR. KEHRLI:  No, Your Honor, not at this time.

7         THE COURT:  Now, Mr. Press.

8         MR. PRESS:  Thank you, Your Honor.  There are some

9    things I'd like to add.  This is an extraordinary form of

10   relief they're seeking.  In effect, what they are saying is

11   they want to cut off my client's access to loans.  Now,

12   regardless of where a company is, from being a start-up to

13   being a very mature company, they need loans.  It is very

14   important to running a business.  A very mature company could

15   require loans in order to get through a lumpy income period

16   and it has nothing to do with the financial position of the

17   company, and what they want to do is cut it off.

18        What they actually admit on page 14 of their

19   memorandum of law, they admit that it could have a negative

20   effect of preventing VAPE from being able to raise any more

21   money.  Now, that's very big problem.  One of the things that

22   I told my colleagues in the hallway before was that they don't

23   want this relief because although VAPE right now is a

24   functioning company that has earnings and is moving along in

25   its business plan, if you took its ability to fund itself

1  along the way interstitially with loans, I suspect that it

2  would have to file Chapter 11, maybe not.

3          THE COURT:  Let me stop you for a moment.

4          MR. PRESS:  Yes.

5          THE COURT:  You say VAPE right now is a functioning

6  company.  The plaintiff argues that VAPE is imminently

7  insolvent because VAPE has approximately $5 million in

8  liabilities which will be due in 12 months and only

9  approximately $629,000 in assets.  This is at Mr. Lerman's

10  declaration, paragraph 17.  What is the financial status of

11  VAPE?

12          MR. PRESS:  I think that what Judge Amon found,

13  which is similar to what Judge Sullivan found in a similar

14  case involving the same company earlier in the year, is that

15  VAPE is an emerging company and its debts are significant but

16  these are longer term debts.  It is able to pay its bills.

17          What happened in this case was, and Your Honor knows

18  this because you were in the room, an agent or I think a

19  principal of GHS was on the phone with Justin Braun and said

20  that they would pay the $151,000, the note assignment.  In

21  effect, GHS, they're the lender.  VAPE needs GHS and has to

22  work with it and GHS turned out to have a mind of its own.

23  After agreeing to pay the $151,000 they attached some further

24  conditions.  I didn't think the conditions were unreasonable,

25  we tried to take care of it and, in fact, Mr. Kehrli admits in

8

1   paragraph 12 of his declaration that GHS said that it was

2   willing to pay, it is just that it wanted to pay in three

3   pieces.  Now, that wasn't what we agreed, I understand that,

4   but they're willing to pay.

5          THE COURT:  Well, quite frankly, that VAPE needs GHS

6   and that GHS is controlling the purse strings here creates the

7   very untenable position that plaintiff finds itself in.  It

8   relied in good faith on the CEO of VAPE who said that this

9   would conclude this --

10         MR. PRESS:  Yes.

11         THE COURT:  -- relationship and though you've made

12  the representation, Mr. Press, that I was in the room and

13  heard that the CEO, who's no longer the CEO of VAPE, was on

14  the phone with GHS, I did not have GHS on the phone, GHS is

15  not a party here and Mr. Braun was representing to the Court

16  that this would be a deal that GHS would sign on to.  I did

17  not have GHS in the room, there is no GHS as a party to this

18  action.  So, that VAPE needs GHS, I believe that the

19  plaintiffs are probably correct, GHS is using VAPE at this

20  point for its own purposes and perhaps GHS should have or

21  could have been named as a party to an action but they're not

22  before the Court and that's where we find ourselves.

23         But my question was really about your client's

24  financial solvency.  When you say that they could go bankrupt,

25  the quotes that Mr. Lerman makes in his declaration I believe

1    are from a public filing, is there anything that has been

2    updated since that time?

3             MR. PRESS:  Not that I'm aware of, Your Honor, but

4    what I would say, there is no material difference between the

5    financial condition of the company now and when Judge Amon

6    found that there wasn't irreparable harm or when Judge

7    Sullivan found in the Southern District that there wasn't

8    irreparable harm.  That hasn't changed.  They've been reliant

9    on lenders, that's known.  They borrowed money from LG and

10   other companies.  They're relying on lenders, they are, many

11   companies are.  And so, in most companies if you said you

12   can't borrow, it would be a major problem.

13            Now, turning to where we are now and how we can

14   practically resolve this case.  I was very surprised to see

15   this motion.  I thought that they were going to renew their

16   original motion to try to convert their note, which I don't

17   think that they were entitled to, I think the judge was

18   correct.  This motion would be highly destructive.  What

19   they're seeking to do is to -- I believe it's self-defeating,

20   they're not going to get -- if the intention was to -- they

21   say they want to stabilize the share price presumably so they

22   can convert but they haven't asked to convert, they haven't

23   made a motion to try to convert.  So, what they're going to

24   do, what they're proposing to do is extraordinary, they're

25   going to say cut off the life blood of the company now and

10

1   we'll just wait and see if we're going to convert.

2           Now, I want to tell you that in discussions I had

3   with Mr. Kehrli, one possible end game that was suggested to

4   me was to try to take over the corporate shell of the company.

5   I don't know if the intention of this motion is to drive the

6   company into bankruptcy is part of some other strategy.  I

7   think the best way to do this is let them -- I don't think

8   this motion should be granted.  I think if they want, they can

9   try to pursue the $151,000 which I've been trying mightily to

10  get them and, as Mr. Kehrli states in his affidavit, it's been

11  offered to him but just in terms different from what we

12  agreed, I understand that, or there are other practical things

13  we can try to do, but I think this relief they're seeking, I

14  think it is unwarranted.

15          I think they're not likely to succeed on the merits.

16  I mean all the arguments we made in connection with the first

17  motion I would incorporate here.  I think the note itself has

18  severe problems but, most of all, this relief that is sought

19  here is misguided, it is going to do the opposite of what they

20  want and I think it would be a huge mistake to grant it.

21          THE COURT:  Anything in reply?

22          MR. KEHRLI:  Yes, Your Honor.  First of all, I do

23  want to say to Mr. Press that I find bringing up what we had

24  in a sort of private conversation on the record was a little

25  inappropriate.  That is not the end game here.  The end game

1    is to stop the shares from being taken and sold away by both

2    related shareholders and GHS.  It is clearly happening.  As

3    Exhibit B to Mr. Lerner's declaration, you can see the trade

4    volume is higher than it was when we started this action.  So,

5    whether it is Mr. Braun who received a stock compensation

6    package upon his resignation or whether it is GHS, someone is

7    converting, someone is selling, someone is profiting, it is

8    not us, we were one of the first note holders here.  That is

9    my client's issue.  My client is entitled to convert this

10   stock at a profit.

11          THE COURT:  What about Mr. Press's point that that's

12   not what your motion is seeking?

13          MR. KEHRLI:  Because if defendant can no longer

14   offer these conversions to everyone else, it will put

15   defendant in a position where they have to honor our

16   agreement, the first agreement, and if they start honoring it,

17   then, you know, we would make a motion to the Court to lift

18   these restrictions.

19          THE COURT:  But wait, stop, roll it back a bit.  The

20   note was not converted upon your demand, that was what you

21   were entitled to, to convert the note.

22          MR. KEHRLI:  Correct.

23          THE COURT:  They did not do that.

24          MR. KEHRLI:  Correct.

25          THE COURT:  You're not asking now to convert the

12

1  note because it has lost so much value that that wouldn't give

2  you the return that your client is seeking, but that's what

3  the note entitled you to, to convert.

4         MR. KEHRLI:  Yes, we are trying to maintain the

5  status quo of the stock price which, as I think we've

6  demonstrated, has plummeted.  The value of the entire note has

7  now plummeted.

8         THE COURT:  I understand but the note entitled you

9  to $75,000 at 8 percent and that you are entitled to convert

10  the note on demand.  They failed to allow the conversion which

11  led to the lawsuit, led to the request for preliminary

12  injunctive relief, but now what you are seeking is different.

13  You're not seeking to convert the note, you're seeking to

14  freeze the defendant's ability to convert any notes.

15         MR. KEHRLI:  That's correct, Your Honor.  We want

16  to level the playing field that we're not being allowed to

17  convert, they've shown no intention to let us convert but they

18  are favoring certain investors including insiders, the

19  legality of which I can't speak to, but there are several

20  people converting, several people, companies.  At this point

21  we'd like to level the playing field, stop the bleeding and

22  pursue our original claims on terms where we can see an end,

23  where there are shares left for my client to convert.

24         THE COURT:  Good segue.  Thank you very much for

25  that segue.  The case has settled for a sum certain, that was

13

1  before the Court and is binding and enforceable.  What do you

2  say to that?

3           MR. KEHRLI:  Upon defendant's breach, we're no

4  longer bound by that contract.

5           THE COURT:  Well, you cite a case for that

6  proposition but upon reading those cases, I don't find that

7  they support your position.  You're citing to a Judge Koeltl

8  case and in the Judge Koeltl case -- let me just pull it

9  out -- so, your reliance is on NAS Electronics, Inc. versus

10  Transtech Electronics PTE, Ltd., 262 F.Supp. 2d 134, 145,

11  (SDNY 2003), and you rely on this case for the proposition

12  that you may pursue your original claim against VAPE and I

13  find that your reliance on that case was misplaced.  In that

14  case judgment had been entered against plaintiffs in the

15  amount of $3.2 million after they breached the settlement

16  agreement.  Plaintiffs then filed a new action in state court

17  which was removed to the Southern District of New York arguing

18  that defendant had breached the contract for failure to

19  perform on the settlement agreement.  The Court granted the

20  defendant summary judgment on the plaintiff's breach of

21  contract claim holding that the defendants, the non-breaching

22  parties were discharged from performing any further

23  obligations under the contract after the breach and that they

24  could elect to terminate the contract and sue for damages.

25  That's not the situation we have here, Mr. Kehrli.

1      MR. KEHRLI:  Your Honor, in my papers I tried to

2   frame and I thought I made clear that when you go through that

3   contract, there were a series of events that had to occur for

4   the next event to happen.  Event one was the money had to come

5   into my firm's escrow; event two, there was an assignment;

6   event three were the mutual general releases.

7      THE COURT:  And you did not do any of those steps.

8   Step one didn't happen and you didn't do step two and step

9   three.

10     MR. KEHRLI:  Right.

11     THE COURT:  Which, extrapolating from Judge Koeltl's

12  decision, you would be relieved of step two and step three

13  because they didn't deposit the money into the escrow account.

14  It doesn't mean that you get to start over at square one and

15  that there is no settlement agreement.

16     MR. KEHRLI:  It is our position that we would be

17  entitled to any general remedy under contract law and that in

18  this case due to the delays, the decline in the financial

19  situation of VAPE and, frankly, the bad faith that went into

20  the settlement agreement, that we should be placed in the

21  position we were prior to entering into this agreement.

22     THE COURT:  But, again, do you recognize that

23  there's a big difference between the case that you're citing

24  to the Court, the Judge Koeltl case, and the case that you are

25  involved in against VAPE?

1      MR. KEHRLI:  I do, Your Honor, and the only last

2  thing I would add is that if Your Honor were to hold us to the

3  damages that we incurred as a result of this breach, they

4  would be very similar to our damages in the beginning of this

5  case because we feel that this delay has caused much more harm

6  than -- it's just extending things longer and longer while the

7  company deteriorates.

8      THE COURT:  But, again, there was a binding and

9  enforceable settlement agreement entered into before the Court

10  and then reduced to a writing which settled the case for a sum

11  certain; why would that not be sufficient?

12      MR. KEHRLI:  Because I think it relates back to the

13  other case I cited.

14      THE COURT:  Which is <u>Media Group versus HSN Direct</u>

15  <u>International Limited</u>, 202 F.R.D. 110 (SDNY 2001).  It's a

16  Judge Lynch case which again you've cited but I don't believe

17  it supports your position.  In that case Judge Lynch denied

18  plaintiff's motion to amend a complaint to add a claim of

19  recision after defendant allegedly failed to comply with the

20  settlement agreement.  Judge Lynch stated that the burden of a

21  rescinded settlement agreement on the parties and on the Court

22  would be particularly severe and basically Judge Lynch said

23  that you shouldn't be able to then use that failure to comply

24  with the settlement agreement to add or amend because people

25  would manipulate their strategy in civil cases; instead of

16

 1    acting to effectuate a settlement, they would use that as one

 2    more reason to add relief.

 3            MR. KEHRLI:  I think the same general premise

 4    applies here.  The manipulation that's occurring is defendant

 5    seeing the bar set here based on our original claims and

 6    saying I'll agree to this 151, maybe we'll make it, maybe we

 7    won't but that will at least set the bar here precluding my

 8    client from going back to his original claims and that

 9    completely undermines the settlement process.

10            THE COURT:  But this is the part that I don't

11    understand, the note was a $75,000 note, I understand it had

12    an 8 percent interest, when you were looking to convert the

13    note, the value was at a certain amount.  Nobody has told me

14    when you first asked to convert and it was not the full amount

15    of the note, it was over $1,000 but under $2,000 of the note,

16    nobody told me what the value would have been had the

17    conversion happened at that very moment.  Likewise, nobody has

18    told me now what the difference would be on the value if you

19    converted the whole note and my thought is that when you

20    bargained for $151,000, that your clients are smart enough

21    business people that that would cover their entire exposure

22    here.

23            MR. KEHRLI:  During our conference with Your Honor

24    we showed you several different calculations.  If you'll

25    recall, it was the average of five days --

1          THE COURT:  I'm so sorry, I don't, Mr. Kehrli, it's

2     not part of the motion and I don't keep those numbers in my

3     head.

4          MR. KEHRLI:  I apologize.  I will explain those

5     figures.  It was an average of five days of five different

6     trading points in each of those days and it calculated out to

7     certain numbers.  Now, we concede in both our opening papers

8     and our reply that it is nearly impossible to calculate this

9     with any precision.  As I mentioned earlier, there's been a

10    400 percent change.  There's changes in trading volume.

11         THE COURT:  But why isn't the $151,000 that the case

12    settled for sufficient?

13         MR. KEHRLI:  It was sufficient at that time because

14    my client was willing to let all of this go for that amount of

15    money on that particular day.

16         THE COURT:  I understand but we're now two months

17    down the road.

18         MR. KEHRLI:  We are.

19         THE COURT:  A month and a half down the road.

20         MR. KEHRLI:  We are, Your Honor, and, again, the

21    stock price keeps going down.

22         THE COURT:  The stock price may fluctuate but the

23    amount that the case settled for would be the same amount.

24         MR. KEHRLI:  That's correct, Your Honor, but I mean

25    two months have passed, my client did not enter into that

18

1    agreement for the purposes of getting a judgment against a

2    company that, as we both essentially admitted, doesn't have

3    the money to pay it.

4          THE COURT:  Thank you.

5          Do you want to be heard on this, Mr. Press?

6          MR. PRESS:  I do, Your Honor.  First of all, I think

7    that the idea the stock has to be -- well, strike that, strike

8    that.

9          I just want to return to the deal that we

10   negotiated.  It was my understanding that $151,000 represented

11   a compromise between my client's position that the note was

12   not enforceable and also our differing monetary calculations

13   for what the damages would be for failure to perform the

14   conversion, okay.  We had differences of opinion.  Our number

15   would be -- even if the note was enforceable, our number was

16   south of $151,000.  Theirs, of course, was far more than

17   $151,000.  $151,000 was a fair compromise under the

18   circumstances and we agreed to it.

19         At this point one thing I find interesting is they

20   complain that the stock price is sinking, okay, and so they

21   say we need this relief so we can stabilize the stock price

22   because it is getting -- because, in effect, they're saying we

23   want to convert but what we could get for the shares is

24   getting less and less and less but they do have this

25   liquidated $151,000.  As Your Honor said, it doesn't change.

19

1    I don't know why they don't want that, why are they pursuing

2    this, I simply don't understand.

3            THE COURT:  I think you do understand, Mr. Press,

4    and I sort of understand that there are things going on behind

5    the scenes, whether we're going to be able to reach behind the

6    scenes, they negotiated in good faith and they feel they've

7    been manipulated by somebody who is pulling the strings at

8    VAPE.  I see that.  However, again, I don't know that this

9    motion is the answer to that.  Again, they have been

10   exceedingly courteous in not trying to say that there was bad

11   faith.  They believe that you and your client at the time

12   intended to settle the case on the terms that had been agreed

13   to.  So, I would not push them past that position.  However,

14   whether Braun was a puppet, whether Braun had any influence

15   over the GHS people who seem to be the sticking point here, I

16   don't know.  I do believe that the plaintiffs have a good

17   faith interest in getting their money out of VAPE and that

18   they're trying to do it in a way that will exert their

19   position and will not be to their detriment in the market.

20   So, if every investor could be manipulated by somebody behind

21   the scenes, which I believe is what LG Capital thinks is

22   happening with VAPE, that would undermine their position in

23   the market.  So, I do think that there are things that are

24   going on here that lead LG Capital in good faith to seek the

25   relief they're seeking.  I just want to hear is there any end

20

1  argument regarding the motion?

2           MR. PRESS:  Well, I just, having heard what you just

3  said, Your Honor, I just first to need to quickly address,

4  I've been a participant in all these negotiations and my

5  impression, I'm just a lawyer but my impression is that

6  everybody wanted the deal to happen, everybody did it in good

7  faith.  My only question about GHS I think and my subjective

8  impression of GHS is that when the gentleman who was on the

9  phone with Mr. Braun said yes, he wasn't thinking everything

10 through and then he kind of woke up with --

11          THE COURT:  That's ridiculous, there's a federal

12 court on the end of the other line --

13          MR. PRESS:  Yeah.

14          THE COURT:  -- and he wasn't thinking it through and

15 then --

16          MR. PRESS:  He's not my client, Your Honor.

17          THE COURT:  Quite frankly, if GHS was named as a

18 party here, I would find that there had been apparent

19 authority but GHS is not a party here so, again, my hands are

20 tied as to GHS's involvement.

21          Anything else on the motion?

22          MR. PRESS:  Well, once again, I just want to close

23 on the fact that the relief they're seeking, I understand they

24 have a complaint, I understand their complaint, we've

25 discussed it.  I just think that the relief they're seeking

1  here is clearly not the answer, it is self-defeating, it is

2  not authorized under the law, it is not narrowly tailored to

3  achieve any purpose.  They say this will stabilize the stock

4  price.  How do they know.  Stock prices go up and down in

5  companies all the time.  How can they say this is going to

6  have that effect, I think it's really a stretch and it's going

7  to cause such a damage to VAPE that I don't think anybody

8  really wants this and I think it would be a big mistake to

9  grant the relief.  Thank you, Your Honor.

10            THE COURT:  Thank you.  We're going to take a

11  moment, I'll be right back.

12            MR. KEHRLI:  Thank you, Your Honor.

13            (Recess taken.)

14            THE COURT:  The Honorable Carol B. Amon referred

15  plaintiff's motion for a preliminary injunction to me for a

16  Report and Recommendation in accordance with 28, United States

17  Code, Section 636(b).  My Report and Recommendation to Judge

18  Amon is as follows.  I have considered the parties' papers and

19  I have heard oral argument.  I respectfully recommend that

20  plaintiff's motion for a preliminary injunction should be

21  denied as plaintiff has not met the irreparable harm standard

22  for preliminary injunctive relief.  Nonetheless, as there is

23  no dispute that VAPE has breached the binding and enforceable

24  settlement agreement, I recommend that judgment should be

25  entered in favor of LG against VAPE in the amount of $151,000.

1          I recommend that plaintiff's motion for a

2    preliminary injunction should be denied as I find that LG has

3    not sufficiently demonstrated that it will suffer irreparable

4    harm in the absence of preliminary relief.  I also agree that

5    the relief that plaintiff is seeking is extraordinary.  As the

6    parties know, the Court must pay "particular attention to

7    whether the remedies available at law, such as monetary

8    damages, are inadequate to compensate for that injury,"

9    and I am citing to Salinger versus Colting, 607 F.3d 68, 80

10   (2d Cir. 2010).  While imminent insolvency may be an exception

11   to the general rule that a monetary injury does not constitute

12   irreparable harm, "a movant must show the risk of insolvency

13   is likely and imminent."  CRP/Extell Parcel I, L.P. versus

14   Cuomo, 394 F.App'x 779, 782 (2d Cir. 2010.)  These cases were

15   all relied upon by Judge Amon in her earlier decision.

16          First, the Court is not persuaded that monetary

17   damages are inadequate to compensate plaintiff's injury and it

18   seems to me that LG has conflated or confused the injury it

19   alleges from VAPE's breach of the note's obligation with the

20   injury it alleges from the breach of the settlement agreement

21   for the sum of $151,000.  Second, even if this Court were to

22   agree that monetary damages are insufficient to compensate

23   plaintiff for the injury, plaintiff has not shown that the

24   risk of VAPE's insolvency is likely and imminent.  While

25   VAPE's breach of the settlement agreement undermines any

1  confidence in VAPE's financial future, it does not establish

2  that VAPE is imminently insolvent.  As Judge Amon found in her

3  initial denial of plaintiff's motion for a preliminary

4  injunction, and as defendant's counsel stated here today,

5  there is no material difference between what was before Judge

6  Amon in May and what has been presented here today as to

7  VAPE's imminent insolvency.  LG has "at most shown that there

8  is a possibility that the company may be insolvent before the

9  conclusion of the litigation, but this possibility is

10 speculative and cannot satisfy [LG's] burden."  And I'm citing

11 to Judge Amon's memo and order which cites to a Southern

12 District of New York 2003 case, <u>Meringolo</u>.  Further, LG does

13 not cite to any cases in support of their position where a

14 preliminary injunction was granted on similar facts.

15 Therefore, as LG has failed to demonstrate an irreparable

16 injury, the Court recommends that their motion for a

17 preliminary injunction should be denied.

18         However, in light of VAPE's breach of the settlement

19 agreement and Paragraph 3 of the parties' signed settlement

20 agreement which states this Court "may retain jurisdiction

21 over this matter and may enter judgment or preliminary relief

22 against either party in the event of any failure to comply

23 with the terms contained in the settlement agreement," I

24 recommend that a judgment in the amount of $151,000 be entered

25 in favor of LG Capital Funding LLC against VAPE Holdings,

1    Inc., and I cite to the settlement agreement which is filed at

2    ECF number 21-1 and it is Exhibit A to ECF number 25-4.  I

3    find no basis or reason to delay the entry of the judgment

4    against defendant in this action.  In making this

5    recommendation, I also find an alternative basis to deny

6    plaintiff's motion for preliminary injunction, that is that

7    upon the entry of judgment, the preliminary relief plaintiff

8    seeks is moot.  "A preliminary injunction is, by definition,

9    preliminary relief and any preliminary injunction would no

10   longer be operative after the entry of the final judgment."

11   Equiom(Isle of Mann) Limited versus Smith Electric Vehicles

12   U.S. Corp. No. 15-CV-2337 (RJS) and 15-CV-2783 (RJS), 2015 WL

13   55470765, *1 (SDNY September 18, 201) (citation omitted).

14           In Equiom, defendants breached the settlement

15   agreement by failing to make payments of over $1.7 million and

16   plaintiff moved for preliminary and other relief.  Judge

17   Sullivan denied plaintiff's motion for a preliminary

18   injunction and ordered entry of the judgment.  Here, as in

19   Equiom, I find that entry of judgment against defendant in the

20   amount the parties had agreed upon renders plaintiff's motion

21   for a preliminary injunction moot.  As set forth in Equiom,

22   should judgment be entered against defendant, LG may seek all

23   post-judgment relief that it is entitled to as set forth in

24   Rules 69 and 70 of the Federal Rules of Civil Procedure.

25           In conclusion, I recommend that plaintiff's motion

1  for a preliminary injunction should be denied but that

2  judgment should be entered in favor of LG Capital against VAPE

3  in the amount of $151,000 as the parties agreed to both on the

4  record before me at the June 8th, 2016 settlement conference

5  and as set forth in the signed settlement agreement dated

6  June 24th, 2016.

7          Objections:  Pursuant to 28, United States Code,

8  Section 636(b)(1) and Rule 72(b)(2) of the Federal Rules of

9  Civil Procedure, the parties have fourteen days from today's

10  hearing, until August 31st, 2016, to electronically file

11  written objections.  Any request for an extension of time to

12  file an objections must be made within the fourteen-day

13  period.  Failure to file a timely objection to this Report

14  generally waives any further judicial review.  Cite to

15  Marcella versus Capital Distribution Physicians' Health Plan,

16  Inc. 293 F.3d 42, 46, (2d Cir. 2002).

17          Is there anything else that needs to be addressed on

18  behalf of the plaintiff?

19          MR. KEHRLI:  No, Your Honor, thank you.

20          THE COURT:  Is there anything further that needs to

21  be addressed on behalf of the defendant?

22          MR. PRESS:  No, Your Honor, thank you.

23          THE COURT:  Then this matter is adjourned.  Thank

24  you.

25          (Time noted:  11:30 a.m.) (End of proceedings.)